# Commonwealth ex rel. *v.* Brown, Appellant.

*Statutes—Repeal—County buildings—Acts of April 4, 1870, P. L. 834, and April 19, 1895, P. L. 38.*

The local Act of April 4, 1870, P. L. 834, entitled "An act relating to contracts by county commissioners in certain counties of the commonwealth," is not repealed by the general Act of April 19, 1895, P. L. 38, entitled "An act to regulate the erection of county buildings."

*County buildings—Westmoreland county—Courthouse—Advertising contract—Specifications—Newspapers—Act of April 4, 1870, P. L. 834.*

The Act of April 4, 1870, P. L. 834, provides as follows: "The county commissioners . . . . before making any contract for the erection of any new building or buildings, bridge or bridges, . . . . shall, by public advertisement, printed in not less than two weekly newspapers of the county, if so many be published therein, where the contract is to be awarded, for not less than four weeks . . . . invite sealed proposals for the same according to the specifications, which shall be written or printed in a book to be kept by the commissioners for that purpose, and kept open for the inspection of all persons for at least four weeks before the time appointed by said advertisement for the opening of said sealed proposals, and which, at the time fixed, shall be publicly opened and the contract awarded to the lowest bidder or bidders." The county commissioners of Westmoreland county fixed upon the time for opening the bids for a new courthouse as Thursday, July 19, 1903. The specifications were deposited in the office of the commissioners for a period considerably longer than the four weeks prior to July 9. Advertisements were published in two weekly newspapers of the county on Tuesdays, June 16, June 23, June 30 and July 7. *Held,* that it was the intention of the act that the advertisements should be published in the identical four weeks during which the specifications were to be on file immediately prior to the opening of the bids; (2) that the first publication was not required to be twenty-eight days before the opening of the bids; (3) that the advertisements complied with the requirements of the act.

Argued April 20, 1904. Appeal, No. 114, April T., 1904, by defendant, from order of C. P. Westmoreland Co., Nov. T., 1903, No. 634, awarding writ of preliminary mandamus in case of Wm. C. Miller & Sons v. John H. Brown, Controller of Westmoreland County. Before RICE, P. J., BEAVER, ORLADY, PORTER, MORRISON and HENDERSON, JJ. Affirmed.

Petition for mandamus.

McCONNELL, J., filed an opinion which was in part as follows:

I. Does the general Act of April 19, 1895, P. L. 38, en-

titled, "An act to regulate the erection of county buildings," repeal the local Act of April. 4, 1870, P. L. 834, entitled, "An act relative to contracts by county commissioners in certain counties of this commonwealth?"

The validity of the contract, which is set up as the essential basis of the liability alleged against the county in this case, depends on the answer to that question. If the local act is repealed by the general act, the relators have no case,—for the general act requires the approval of "the judges" of the court of common pleas, and the proffered contract has received the approval of but one of the two judges of the court of common pleas. The local act, however, makes the approval of but one essential to the validity of the contract and, if it applies, that difficulty can be successfully passed. Before referring to the authorities applicable to this question, it is to be noted that the titles to the two acts fairly indicate, in a general way, the purpose of the acts respectively. The thing on which the local act is intended to operate is the contracting power of county commissioners in eleven counties of the state, including Westmoreland. Prior to the passage of that act, the power of the commissioners to contract for and in behalf of their respective counties was unlimited by any kind of supervision of any other official of the county. By their uncontrolled action, the county acted in consummating contracts.

It was intended, by this act of 1870, to remedy what was by the legislature conceived to be a mischief growing out of the commissioners' unlimited power to contract for the county with respect to certain important transactions. The mode employed to correct the supposed evil was to prescribe a certain procedure which was to be followed by the commissioners in advance of their contracting in behalf of the county, and, in addition thereto, it was provided "that no contract shall be awarded by county commissioners until the same, with the sureties for its faithful performance, shall be approved by one of the judges of the court of common pleas of the proper county."

The county commissioners were, by this act, left to be the accredited contracting agents of the county, as they had always theretofore been, but their contracting power was confined by new limitations, and henceforth, if the county was to be bound by their contract, it must be done within those limitations.

The subject-matter of this act being the contracting power of the agents of the county, it deals in detail with the essential procedure that must precede the actual conclusion of the contract, the notice to be given, the means to be employed to afford contractors an opportunity to inspect the specifications, for the work, the form in which bids are to be received, the time and the manner of opening the bids, and declaring the result of the bidding, and the security to be given. In addition to this, no contract shall be awarded until the same, with the sureties for its faithful performance, is approved by one of the judges of the court of common pleas. The prescribing of approval by "one of the judges" implies a discriminating choice between approval by one of the judges, and approval by a plurality of judges. The essentials to a valid contract by the county are, therefore, dealt with, with particularity and completeness.

The kind of contracts, to which these regulations apply, are contracts "for the erection of any new building or buildings, bridge or bridges, or for the alteration or addition thereto."

On the other hand, the general act of 1895, not purporting to deal with the specific subject of the contracting power of county commissioners, is more general and less given to particularity and detail, with respect to contracts. Its function is "to regulate the erection of county buildings," and, in so far as it alludes to contracts at all, it requires that they be approved by the "judges" of the court of common pleas. The contracts to which it alludes are only for the "erection of a courthouse, jail or other county building" while the local act pertains to contracts for the "erection of any new building or buildings, bridge or bridges or the alteration or addition thereto.

Our question pertains to the validity of the contract made by the county commissioners with Wm. Miller & Sons, and not to any alleged omission of any step essential to the procedure for the erection of county buildings. On that subject the local act is specific and particular, while the act of 1895 is a general affirmative statute, touching on the subject of contracts only as one of the incidents of the erection of county buildings.

These considerations will be again alluded to, in considering

the question of whether the legislature has manifested an intention to substitute the provisions of the act of 1895 for the particular provisions of the act of 1870.

We will now consider the authorities bearing on the essentials of a repeal : There is no repealing clause in the act of 1895. There is no expressed declaration of an intention to effect a repeal,—any law is but the expression of the will of the legislative body. " It is presumed to be the legislative intent that a statute once enacted is enacted for all time, in the absence of an expression of a contrary intent : " 23 Am. & Eng. Ency. of Law, 473 ; Potter's Dwarris on Statutes, 153 ; United States v. Gear, 44 U. S. 120.

The lawmaking power must in some way have manifested an intention to repeal the act of 1870, otherwise it is still in full force. It has not manifested such intention in the ordinary way, by expressly stating that intention. Has it put anything into the act of 1895 which, in legal effect, is equivalent to the statement of such an intention ?

It must be observed (1) that the act of 1870 is a local statute, applying to only eleven of the sixty-seven counties in the state, and, (2) that it is special and particular, dealing with the subject-matter of the power of county commissioners to make contracts in behalf of the county.

On the other hand the act of 1895 is general, and is designed to furnish a system of regulating the erection of county buildings throughout the state.

Where the prior law is local and particular, and the latter law is general, there is no presumption of an intention to repeal the prior law by the later one. On the contrary there is a very strong presumption that no such intent exists. " A general law will not repeal an earlier special act by mere implication : " 23 Am. & Eng. Ency. of Law, 422. In Seward v. Vera Cruz, L. R. 10 Appeal Cases, 59, SELBORNE, L. C., said : " If anything be certain it is this, that where there are general words in a later act capable of reasonable and sensible application without extending them to a subject specially dealt with by earlier legislation, you are not to hold that earlier and special legislation indirectly repealed, altered or derogated from, merely by force of such general words, without any indication of the particular intention to do so."

" A general statute, without negative words, does not repeal a particular statute, inconsistent therewith:" Brown v. County Commissioners, 21 Pa. 37 ; O'Hara v. Johnson, 2 Walker, 115 ; Murdock's Petition, 149 Pa. 341.

" A mere general law without negative words cannot repeal a previous special statute, although the provisions of the two acts are different: " Com. v. P. & E. R. R. Co., 164 Pa. 252.

" Later statutes, which are general, do not repeal an earlier one, which is particular : " Bounty Acc'ts, 70 Pa. 92.

There is also a presumption against an intent to repeal, by a general law, the provisions of a local law.   The act of 1870 is not only a special and particular law operating on a special subject-matter, but it is also a local law applying to only eleven counties of the state.

In the case of Morrison v. Fayette County, 127 Pa. 110, a local law, passed in 1869, had provided $3.00 per day as the compensation for county auditors in that county.   By a general law passed May 12, 1887, $3.00 per day and mileage was fixed as the compensation for each county.   It was held that the later general act did not ·repeal the prior local act, and, therefore, that the auditors were only entitled to $3.00 per day, without mileage.

In Malloy v. Commonwealth, 115 Pa. 25, it is held that " the Act of May 10, 1871, P. L. 705, a local act, incorporating a borough, under which the collectors are appointed by the borough councils, is not repealed by the general Act of June 25, 1885, P. L. 187, providing for the appointment of tax collector to fill a vacancy by the court of quarter sessions of the peace, for, while as to general statutes, a later statute may repeal a former statute without express language to that effect, by necessary implication, a general statute, rarely, if ever, repeals a local statute by mere implication."

As between general statutes, irreconcilable inconsistencies between an earlier and a later statute on the same subject-matter, of themselves import an intention, on the part of the legislature, to effect a repeal, to the extent, at least, of the irreconcilable inconsistencies, but mere inconsistencies, of themselves, import no such intention, where the earlier statute is local and particular, and the later one is a general, affirmative statute. It is said in the opinion of the court in Westfield Borough v.

Tioga Co., 150 Pa. 152, that where there is such irreconcilable conflict between two general laws upon the same subject that they cannot be harmonized with each other and thus be made to stand together and both be concurrently enforced, the latter necessarily implies the intended repeal of the earlier one, without any express negation of it: Bank v. Com., 10 Pa. 442; Egypt Street, 2 Grant, 455. But when the conflict is between a local and a general law, the rule of construction is different, and generally the former will not be repealed by the latter, unless there be some clear expression of a negative intent." The reason for this distinction is perfectly obvious : The eye of the legislature is fixed on a mischief that affects the commonwealth at large, when a general law is being passed, and without special language to indicate it, there is no evidence to justify the conclusion that it was the intended function of the general law to operate on a situation in a particular locality, where that special mischief had already been removed, or, at least, did not exist in the form which the general law was designed to operate upon. There is nothing to indicate that the particular locality affected by the local law had anything in its situation that was regarded as being mischievous and in need of a remedy which the enacted law affords. It is presumed that it is the function of a general affirmative statute to affirm only, and not to repeal, and to affirm with respect to an intended reform of a mischief that affects the commonwealth at large. Endlich on Interpretation of Statutes, sec. 223, says : "It is but a particular application of the general presumption against an intention to alter the law beyond the immediate scope of the statute, to say that a general act is to be construed towards a special and a particular one, that is one directed towards a special object, or a special class of objects. A general later affirmative law does not abrogate an earlier special one by mere implication. . . . It is usually presumed to have only general cases in view, and not particular cases which have been already otherwise provided for by the special act, or, what is the same thing, a local question. Having already given its attention to the particular subject, and provided for it, the legislature is reasonably presumed not to intend to alter that special provision by a subsequent general enactment, unless that intention is manifested in explicit language, or there be something which

shows that the attention of the legislature had been turned to the special act, and that the general one was intended to embrace the special cases within the previous one, or something in the nature of the general one making it unlikely that an exception was intended as regards the special act. The general statute is read as silently excluding from its operation the cases which have been provided for by the special one; for, as was said of the relation of a general act to a local one applying to a single county of the state, "it is against reason to suppose that the legislature, in framing a general system for the state, intended to repeal a special act which the local circumstances of one county had made necessary. The fact that the general act contains a clause repealing acts inconsistent with it does not diminish the force of this rule of construction." In the case of Malloy v. Com., 115 Pa. 25, Mr. Justice TRUNKEY, delivering the opinion of the court, said: "While a later statute may repeal a former statute without express language to that effect by necessary implication, yet the learning of the courts is strongly against such construction: Sifred v. Com., 15 W. N. C. 373. That is the rule as to general statutes. A local statute enacted for a particular municipality, for reasons satisfactory to the legislature, is intended to be exceptional and for the benefit of such municipality. It has been said that it is against reason to suppose that the legislature in framing a general system for the state intended to repeal a special act which the local circumstances made necessary: Brown v. Commissioners, 21 Pa. 37. The legislature, not the courts, judge of the necessity. Rarely, if ever, does a case arise, where it can be justly held that a general statute repeals a local statute by mere implication."

In the case of the Mayor of Harrisburg v. Dauphin Co., 2 Pearson, 35, Judge PEARSON, speaking of special and local laws, says: "They are not revoked by general laws, even if inconsistent with their provisions, unless where the special act appears to have been in the minds of the legislature at the time. The words of a general public law will not be construed as applying to a special private exception, although the words appear broad enough to have that effect: Sedgwick on Statutory and Constitutional Law, 123, 124, 127, etc.; Dwarris on Statutes, 514; Darcy's Case, Cro. Eliz. 512. This same doc-

trine is recognized in Pennsylvania: 6 W. & S. 209 ; 9 Harris, 43."

These cases, and others, which might be cited, show why it is that there is no implication of an intention to repeal a local law by the enactment of a general law touching the same subject, but with inconsistent provisions, while there might be such an implication if both laws were general. In all the cases cited the locality in which the local law was operative was so insulated thereby as to be free from the energy of the later general law, which in terms was comprehensive enough to include that locality. The general statute was read as " silently excluding from its operation the cases which has been provided for by the special one." There was no evidence in the mere general language of the later statute that its energies were intended to be operative for the repeal of the local statute, in addition to the correction of a particular mischief that affected the state in general, but which, by reason of the local law, did not affect that locality.

In such cases, the consistency of the words of the two acts was not held to be material, inasmuch as each moved in its own appropriate sphere, and there was no possibility of collision.

These cases are selected, not because it is necessary to cite authorities to establish the rule so often reiterated, viz : that a local statute will not, by mere inplication, be held to be repealed by a subsequent general one, but because they disclose the reason that gives that rule its life. That reason is important when we come to consider the strength of the position taken by the respondent with regard to the rule being inapplicable to the facts of this case. The rule is not denied by any party to this case.

The state of the case has, therefore, advanced to this point: The local law of 1870, like every other law, is presumed to be intended to remain operative until the legislature declares a contrary intention. They have not done so by express declaration, through any repealing clause inserted in the act of 1895.

They have not done so by implication through the mere use of such general language as is ordinarily employed in the framing of a general act, although that general language, but for the local law, would comprehend the particular locality where the local law operates, as well as other parts of the state at

large.  The authorities cited in support of the rule do not hold that it is a legal impossibility to repeal a local or special law by a later general one.  They simply hold that it will not be presumed that the legislature so intended, without some express and clear manifestation of an intention so to do.

In what other ways can such an intention be manifested?

Counsel for respondent, in their brief, thus state their position: " The general rule undoubtedly is that a prior local statute is not repealed by a subsequent general one.  Such repeal will, however, take effect if it appears to be the intention of the legislature to repeal the former act though no repealing clause be found in the latter.  The sweeping and general character of the language itself may not effect the repeal; but if the reasonable inference from the new act is that a new and uniform system is to be established generally throughout the state without an exception, then the earlier act must be repealed."

That we regard as an accurate statement or law in the abstract.

We have thus far only been dealing with presumptions. The thing to be sought is the intent of the legislature and the legal presumptions are but aids to ascertain that intent.  If they clearly show that in passing the law, the lawgivers had in view the particular situation produced by the local law, as well as the general situation where that local law did not run, and that they intended the act to operate on the particular, as well as on the general situation, irreconcilable inconsistencies in the two acts may demonstrate an intention to repeal the local law, in the same manner that such inconsistencies would demonstrate that intent, in case both were general laws.

But it must clearly appear that, by the intent of the legislature, the two acts were thrown in conflict with each other.  It will not do to take, as the starting point, a comparison of the provisions of the two acts, and, finding them variant from each other, to conclude at once that an intention to repeal was manifested.  That variance is of no consequence, unless it also appear that it was the intention of the legislature that the acts should be thrown into conflict with each other, that is to say that they were intended to operate on the same subject-matter.  It is not hard to find points of difference in two acts

of assembly, but that discovery does not advance the question one step, unless we also find that they were intended to operate on the same thing. If the local act is to continue to operate in its own limited sphere, and the general act to operate at large, they do not collide with each other, and the variations go for nothing. The intent that is to be sought for is an intent to substitute the provisions of the general act for those of the local act. " There is no repeal where the intendment of the general is not to supply the local : " Seifried v. Com., 101 Pa. 200. " If anything be certain it is this, that where there are general words in a later act capable of reasonable and sensible ·application without extending them to a subject specially dealt with by earlier legislation, you are not to hold that earlier and special legislation indirectly repealed, altered or derogated from, merely by force of such general words without any indication of a particular intention–to do so : " Seward v. Cera Cruz, L. R. 10 App. Cas. 59.

There is nothing in the terms of the general act of 1895 except the general language appropriate to the enactment of a general law for the state. It does not purport to be a supplement to the local law, nor extend its provisions in any way. There is nothing to indicate that the intention of the lawgivers was directed to the special conditions existing in the eleven counties to which the local law applies. " Where there is an act of parliament which deals in a general way with the subject-matter of the previous legislation, the court ought not to hold that general words, in such a general act, effect a repeal of the prior and special legislation, unless it can find some reference in the general act to the prior and special legislation, or unless effect cannot be given the provisions of the general act without holding that there was such repeal : " In re Smith's Est., 35 Ch. Div. 589. As above stated, there is absolutely no reference in the general act to the prior local one, and effect can be given to the general act without, in the least, impairing the efficacy of the local act, for the reason that there is nothing in the act indicating the existence of the particular intent that it must, regardless of the ordinary legal consideration, be completely and fully operative in every county of the state, and there is an ample field for its operation when the ordinary legal considerations are permitted to operate. The act

of 1895 is simply a general affirmative statute, and it evinces
no other purpose than to affirm a general law.   All that Mr.
Justice HEYDRICK said, in Bell v. Allegheny Co., 149 Pa. 381,
of the evidence of an intent to repeal a local act contained in
the general act of 1876 can be appropriately applied to the act
of 1895, viz : " It is a rule of interpretation as old as the com-
mon law and followed in an unbroken line of decisions in the
state, that a general affirmative statute will not repeal a par-
ticular statute upon the same subject, though the provisions of
the former be different from those of the latter.   The act of
1876 is affirmative, and is no evidence of an intent to repeal
any special or local laws regulating the compensation of offi-
cers in particular counties."   There is inherent in the act of
1895 no evidence of a particular intent to repeal local or spe-
cial laws on the same subject.   That particular intent is pre-
cisely what we are in search of.   In all the cases cited by
respondent's counsel the presence of that particular intent is
manifest, and, therefore, the rule discussed had no application
to them.   In that respect they differ from the case at bar :
Weaver v. Schuylkill Co., 17 Pa. Superior Ct. 327.

   In that case it was held that " the general Act of July 14,
1897, P. L. 266, which forbids any policemen to charge or ac-
cept any fee or other compensation in addition to his salary,
repeals the 25th section of the Act of April 4, 1831, P. L.
439, which provides that policemen in the borough of Potts-
ville shall receive the same fees as the constables of the said
borough are entitled to by law."   What evidence is disclosed
by the terms of the act of 1897 that it was to operate every-
where, regardless of prior special or general laws ?   Its title
is " An act to regulate the remuneration of policemen and con-
stables employed as policemen throughout the commonwealth
of Pennsylvania, and prohibiting them from charging or accept-
ing any fee or other compensation, in addition to their salary,
except as public rewards and mileage for traveling expenses."
The first section begins as follows : " That from and after
the passage of this act all municipalities or corporations, em-
ploying policemen within the commonwealth of Pennsylvania,
shall pay to all such policemen a fixed or stipulated salary," etc.
The 2d section says : " That from and after the passage of this
act, it shall not be lawful for any high, ward, township or other

constable who is at the same time employed as a policeman in any city, borough, or other part of this commonwealth," etc. What language could more forcibly express the intention of the legislature to make the act operative in every municipality of the commonwealth? No prior act either general or special could withstand the force of this plainly expressed intent. The act was intended to operate in the borough of Pottsville as well as in every other borough in the commonwealth. A local act with an inconsistent provision had been previously in force in that borough. Therefore, by the clear intendment of the legislature, the two acts were thrown into conflict and both could not stand. Of course the local act would go down. In addition to this the 4th section is as follows: "That all acts or parts of acts in force at the date of the passage of this act inconsistent with its provisions are hereby repealed."

Where there is such clear expression of an intent to repeal, there is no room for construction. The case at bar has no resemblance to that case.

2. Com. ex rel. v. Summerville, 204 Pa. 300. This is also a clear case. The general Act of June 4, 1879, P. L. 78, was held to effect a repeal of the local Acts of March 21, 1865, P. L. 501, April 11, 1866, P. L. 608, and April 10, 1873, P. L. 763, relating to Clarion county.

The title to the general act of June 4, 1879, was: "An act to create poor districts and to authorize purchase of land and erection of buildings, to furnish relief and give employment to the destitute poor and paupers in this commonwealth." The 1st section is: "That for the purpose of furnishing relief to the poor, destitute and paupers, giving them employment and carrying out the provisions of this act each county of this commonwealth is hereby created a district to be known as County Poor District." The 2d section begins: "That the commissioners of each county are authorized," etc. Section 21 is as follows: "This act shall not be construed to repeal any local act, or acts under which poorhouses or homes for the relief of the destitute have been erected or are now managed or controlled, nor repeal any general law under which lands have been purchased or poorhouses have been commenced to be built." At the date of the passage of the act of June 4, 1879, there had not been erected poorhouse or home for the relief of the

destitute nor were there, at that time controlled or managed, nor had lands been purchased or poorhouse commenced to be built, within the said county of Clarion, or said poor district.    There was, therefore, nothing in the situation into which the afore-said local laws had brought them, that placed them literally within the saving of the 21st section.    That section showed that the lawgivers had their attention drawn to particular sit-uations as well as to general situations, and that they had pro-vided for both, to the extent thought necessary.    The opinion on page 303, says: " Contrasting the provisions of the acts of 1865 and 1866 with those of 1879, it is most manifest that the legislative intent was that those of the latter were intended to be a substitute for the former and, in such case, although the later act contains no express words to that effect, it must, on principle, as well as in reason and common sense, operate the repeal of the former :   Johnston's Estate, 33 Pa. 511 ; Best v. Baumgardner, 122 Pa. 17."

Nothing can more clearly show the ratio decidendi than the following terse language of Mr. Justice BROWN, found on page 304 : " That the legislature intended the act of 1879 to be not only a substitute for prior local acts upon the same subject-matter, but that it should operate as a repeal of them is most manifest from the 21st section, which is : ' This act shall not be construed to repeal any local act or acts under which poor-houses or homes for relief of the destitute had been erected or are now managed or controlled, nor repeal any general law under which lands have been purchased or poorhouses have been commenced to be built.'    So clearly did the legislative mind think it had expressed itself in the first twenty sections as intending to repeal all local acts, and that its intention would be so understood, that it inserted the last and saving clause, where, if the appellants cannot find their exemption from the act, there is none for them.    When the legislature declared what local acts alone should be saved from repeal by this substitution-ary act, those not within the exception were without it.    What was not saved by the act fell under it, and the legislative intent cannot be understood otherwise.    On June 4, 1879, no poor-house and home for the relief of the destitute had been erected or was managed or controlled under any local act in Clarion county, nor had lands been purchased or poorhouses com-

menced to be built; and the county is not within the saving clause of the act, Expressio unius est exclusio alterius. " The exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made:" MARSHALL, C. J., in Brown v. Maryland, 17 U. S. 419, 438.

There is nothing in the facts of the case at bar that brings it within the law so clearly defined in Com. v. Summerville.

3. McCleary v. Allegheny Co., 163 Pa. 578. " In that case, it was decided that where a local act provides that the compensation of the public officer shall be partly by salary and partly by fees, and a subsequent general act provides that the compensation shall be entirely salary, the two acts cannot stand together and the local act is repealed by the general act." Section 5 of article XIV of the constitution had provided that " in counties containing over 150,000 inhabitants all county officers shall be paid by salary and the salary of any such officer and his clerks heretofore paid by fees shall not exceed the aggregate amount of fees earned during his term and collected by or for him." This section was a mandate to the legislature to provide by law a salary for all county officers, in counties whose population made them subject to the constitutional provisions : Perot's Appeal, 86 Pa. 335. On March 31, 1876, P. L. 13, there was approved " an act to carry into effect section 5 of article XIV of the constitution, relative to the salaries of county officers and the payment of the fees received by them into the state or county treasury, in counties containing over 150,000 inhabitants."

The different sections of the act are framed so as to effect its professed purpose. Under the local act of 1872 the sheriff was to be paid in part by salary and in part by fees. Under the general act he was to be paid entirely by salary. Both were plainly designed to be operative on the same subject-matter— both to apply in the same county. They were inconsistent with each other, and could not stand together. The purpose of the constitution filled the letter of the act of 1876, and to effect that purpose all statutes, whether general or local, that authorized the payment of officers otherwise than by salary, must necessarily be stricken down. In addition to this clearly

expressed purpose there was a clause which provided that " all laws or parts of laws inconsistent with this act are hereby repealed," etc.

The act of 1895 professes to execute no such constitutional mandate as this, and has no repealing clause.

4. The County of Allegheny v. Grier, 179 Pa. 639. In this case it was held that " the Act of May 7, 1864, P. L. 879, fixing the salary of the controller of Allegheny county at $3,000 is not repealed by the Act of March 31, 1876, P. L. 13." This was because the local act had already given what the constitutional mandate required, viz : a fixed salary. The express purpose of the act of 1876 did not require the striking down of this local act, relating to the controller's salary. Although the act of 1876 provided a different salary, the controller was not entitled to the increase, inasmuch as the general act and the local act could stand together, each operating within its own appropriate sphere. The particular intent of the legislature did not throw the two acts into conflict, and left operative the general rule that a local act is not repealed by implication, through the subsequent passage of a general act on the same subject. This case serves to establish, not to overthrow, the rule. The explanation of the apparent contradiction by it of the case next preceding it, is thus given by Mr. Chief Justice STERRETT : " The principle which underlies the construction heretofore given the act of 1876 and its supplements is too plain for question. The constitution had declared that in counties of a specified class, their officers should be paid by fixed salaries ; and the legislature sought by that act to accomplish this purpose. It accordingly struck down all prior acts which provided for the payment of such officers in fees, as being necessarily inconsistent with the constitutional mandate ; and hence McCleary v. Allegheny County, 163 Pa. 578, and allied cases ; and left those acts which provided for the payment of fixed salaries, because consistent ; and hence Bell v. Allegheny County, 149 Pa. 381. The operation of the act was limited by the accomplishment of its purpose. The act of 1861 being in entire harmony with the constitutional intent, it would have been vain and useless to have stricken it down. The act of 1864 which fixed the controller's salary belongs to the same category, and hence the court below was clearly right in holding that the

present case is not distinguishable in this respect from Bell v. Allegheny County, supra."

This case is an example of the application of the rule and not of an exception to it.

In the above enumerated cases, with the exception of the fourth, the particular intendment of the legislature which threw the general act into collision with the prior local one is very clear and distinct. In most of the cases there is also an express clause of repeal.

As we have already stated, in the case at bar, there is no manifestation whatever in the act of 1895 that it was one of its purposes to effect a repeal of any local act. It is a general affirmative statute without a repealing clause.

It is true that there are cases in which it has been held that a clearly expressed purpose, on the part of the legislature, to accomplish results which can only be accomplished by striking down local laws through the later general ones, will justify a conclusion that there was an implied repeal, but those cases will not aid us any, in a case where there is no such intent manifested in the general act. The differences between the provisions of a local and a subsequent general act are not, of themselves, evidence of an intent to repeal, and, therefore, they leave undisturbed the operation of the presumption that there is no intent to repeal. It is only when there is a clearly manifested legislative intent disclosed to force the later act into operation on the same subject-matter as the local law theretofore operated on, that the differing provisions of the two acts became repugnant to each other. Of that particular intent there is no evidence to be found in the act of 1895. These are the authorities relied on by respondent.

There is, however, one other point of the argument of respondent's counsel that invites careful consideration.

Article 3, section 7, of the constitution of Pennsylvania, among other things, provides as follows : " The general assembly shall not pass any local or special laws regulating the affairs of counties, cities, townships, wards, boroughs or school districts, . . . . creating offices or prescribing the powers and duties of officers, in counties, cities, boroughs, townships, election or school districts."

Of course, it would, since the adoption of the new constitu-

tion, be impossible to pass the act of 1870, by reason of the pro-
hibition in these constitutional provisions.   That act, however,
was in full force at the time of the adoption of the new consti-
tution, and that constitution did not have the effect of repeal-
ing it.   It is contended, however, that the act of 1895, by reason
of those constitutional provisions, must be allowed to have the
effect of operating the repeal of the local act.

We have already concluded that the provisions of the act of
1895, of themselves, disclosed no evidence of such intent on the
part of the lawgivers.   If that is the case, then the whole stress
of the case bears on the existence of the prohibitions contained
in the constitutional provisions.   Do they require us to conclude
that the legislature, in passing a general law on subjects about
which it could pass no local law, must, 'of necessity, have
meant to repeal existing local laws, although there is nothing
in the general law expressive of any such intent ?

It is plain that the provisions of the constitution above quoted
are only prospective in their operation, and that that instrument
does not itself effect a repeal of then existing local laws.   Mr.
Justice PAXSON delivering the opinion of the Superior Court,
in County of Allegheny v. Gibson, 90 Pa. 397, says : " It may
be conceded that if the act of 1841 had been passed subsequent
to the adoption of the constitution, it would have been a local
or special law regulating the affairs of counties, cities, town-
ships, wards, boroughs, or school districts," and therefore within
its prohibition.   But such prohibition is prospective.   Its lan-
guage is, " The general assembly shall not pass."   Hence it is
plain that the act of 1841 is not affected by the prohibition ;
the only question is, was it repealed ?   After reviewing the au-
thorities, the following conclusion is reached : " The principle
that local or special laws were not ipso facto repealed by the
adoption of the present constitution is too firmly established to
be overturned or shaken."

Elsewhere in the opinion it is said : " The late convention had
in it some of the ablest constitutional lawyers in the state, among
whom were two ex-chief justices of this court.   Whenever
that body desired the constitution to act retrospectively and re-
peal existing laws, they know how to do it."   There are then
given numerous instances in which that had been done.

In Evans v. Phillipi, 117 Pa. 226, it was held that : " The

constitution in its prohibitions of special legislation is prospective only and does not effect a repeal of local statutes with inconsistent provisions in force at the time of its adoption ; nor was it its intent and meaning that all future legislation should be conditioned on the repeal of such local laws."

A statute general in form is not to be treated as local or special, simply because of the intervention of some unrepealed local statute which prevents it having general effect.

The constitution therefore left the act of 1870 unrepealed.

The power to pass the act of 1895 was not subject to any condition imposed by the constitution that that act must repeal the act of 1870, in order that it be valid, and the act of 1895 is not itself made to be a local law, simply because of the intervention of the unrepealed local act of 1870 which prevents its having effect in Westmoreland county.

The constitutional provision is not a mandate on the legislature to enact a repeal of the local law. It leaves the question of when or whether ever local laws are to be repealed, entirely to the determination of the legislature. It prevents the increase of local laws in the future and provides that "laws repealing local or special acts may be passed," but it does not command the legislature to repeal them. If this is correct (and nothing but the text of the constitution is needed to show its correctness), we must still look into the act alleged to effect a repeal for some manifestation of an intent to bring about that result. If it is a thing that only the intent of the legislature may compass—the thing to be sought is a manifestation of what the legislature itself has deliberately adopted as the evidence of what its will is—that is to say, if the statute which is alleged to effect the repeal. What evidence inheres in its terms, or in its substance, that can be fairly said to impute to the legislature an intent to repeal? This is ordinarily the inquiry. The substance of respondent's contention is, however, that, in passing this general act of 1895 (which, by its own terms, when tested by all the rules ordinarily applicable for that purpose, gives no manifestation of an intent to repeal the act of 1870), the legislature must, nevertheless, have imputed to it such an intent, solely because of the constitutional provision about future special and local legislation. It would be one thing to read the act of 1895, and to examine any of its

provisions which of themselves in any way indicate an intent to repeal, and to make this examination in the light of the constitutional provision, but it would be an entirely different thing to impute to the legislature an attempt to repeal solely by reason of what the constitution contains,—the act itself being entirely destitute of an intrinsic evidence on the subject. The constitution does not affect a repeal, it does not command the legislature to effect a repeal, it does not condition the right of the legislature to enact a general law on the subject-matter of the provisions of a local law without its effecting a repeal of the prior local law.

The constitution standing by itself does not affect a repeal. The act of assembly is not predicted on the constitutional provision and does not profess to carry it into execution. In this condition of things, whence arises the imputation that the legislature intended, by the passage of the act of 1895, to repeal the local act?

In support of the respondent's contention on this point, two cases are cited:

1. Com. v. Wunch, 167 Pa. 186. In the very brief per curiam opinion of the court, the following language is used: "Since the adoption of the present constitution the legislature has sought to bring about uniformity in the administration of the affairs of counties and townships as well as those of cities and boroughs. The constitution requires this, and we have felt constrained to interpret statutes relating to these subjects in the light of the constitutional requirements."

In this, there is no indication that the question does not depend on the interpretation of the statute, but a very plain indication that it does so depend. It is the statute that is to be interpreted, and that is to be done in the light of the constitutional provisions.

But what was the statute that was to be so interpreted? The Act of March 18, 1852, P. L. 153, was a local law, applicable to the township of Longswamp, in the county of Berks. By its provisions the collection of taxes was to be intrusted to the lowest bidder.

The act of 1893 was alleged to have effected a repeal of that local law. Its title was "An act to authorize the election of tax collectors for the term of three years in the several bor-

oughs and townships of this commonwealth." Section 1 provided " that the qualified voters of every borough and township in the commonwealth of Pennsylvania shall," etc. The 2d section provides that " all acts or parts of acts inconsistent herewith are hereby repealed."

These provisions were plainly indicative of an intent, on the part of the legislature, that the provisions of the act should be operative in every borough and township in the commonwealth of Pennsylvania, regardless of present existing conditions. By the clear intendment of the legislature the act would be thrown into direct conflict with any then existing contrary provisions in local law. The intent of the act was that it should operate in " every " borough and township, and that it could not do, if local laws suspend its operations in some boroughs and townships. The repealing clause expressly declared that all acts or parts of acts inconsistent with it should be repealed. If it was the intent of the legislature that the acts should operate in " every " township, and the local act prevented its having effect in Longswamp township, it was certainly inconsistent with the general act, and was expressly repealed thereby. The provisions of the general act afford abundant evidence of a particular intent to repeal inconsistent local laws. The court simply said that the interpretation of the statute itself should be made in the light of the constitutional provisions looking to uniformity in such matters.

That is entirely different from saying that the constitution itself, of its own inherent vigor, imputed to the legislature an intent to repeal a local law, which, of itself, afforded no evidence of any such intent.

In addition to this, the court expressly declared that the case is disposed of by the rule laid down in Com. v. Macferron, 152 Pa. 244, and by Quinn v. Cumberland County, 162 Pa. 55.

In the first of these cases it was held " that while a previous local statute is not repealed by a subsequent general statute inconsistent with it, unless words of repeal are employed, yet such rule is not applicable to classification acts," for three reasons, the first of which is, " because the legislative intent to repeal local laws is fully expressed in those acts."

In Quinn v. Cumberland County it was held that the general Act of May 11, 1894, P. L. 44, repeals the special act of Jan-

uary 28, 1867.  The general act was entitled, " An act to enable borough councils to establish boards of health."  The 1st section provided " that it shall be the duty of the president of the town council or burgess where he is the presiding officer, of every borough in this commonwealth, within six months after the passage of this act, to nominate," etc.  There was, therefore, a direct and specific intent to embrace " every borough."  It is not the indefinite " a " or " any " which precedes the word " borough," but it is the word " every " which precedes it.  That signifies all of a collective or aggregate number, taken one by one.  " A proposition, containing " every " before a class name, is equivalent to the totality of statements formed by replacing this expression by the name of each individual of the class : "  Century Dict.  Therefore, looking at nothing but the act of 1893, it appears that the lawgiver had declared that the act applied to all the boroughs in the commonwealth, considering them one by one.  The intendment of the statute necessarily threw the act into conflict with any local law having inconsistent provisions, and, in addition to this, the 8th section expressly declared that " all acts or parts of acts inconsistent with, or contrary to the provisions of this act, are hereby repealed."  There were not only differences between the general and local acts—but those acts were clearly intended to be applied to the same subject-matter, thus producing conflict—but there was also, in the general act, a specific repealing clause which applied to that condition of things.  The statute itself afforded abundant evidence of an intent to repeal, and, reading that statute in the light of the constitutional provision, it was held that it did repeal the local act.

It seems plain that neither the case of Com. v. Wunch, nor any case referred to therein, nor anything that is said in any of those cases, goes so far as to hold that an intention to repeal a local act can be imputed to the legislature from its subsequent passage of a general act which neither by its terms, its substance or by the addition of any repealing clause has manifested any such intention.  What is manifested by the act is to be examined in the light of the constitutional provision, but there must be something about the act to examine.  The cases do not hold that the imputation of the intent can arise wholly and solely from the constitutional provision itself.  To meet the

exigency of the situation in which respondent has chosen to place himself in this case, there should be shown authority that would go to that extent.

2. Jadwin v. Hurley, 10 Pa. Superior Ct. 104. The 3d section of the general Act of April 20, 1887, P. L. 60, which provided that "the appointment of mercantile appraisers shall be made annually by the county commissioners, except in cities of the first class where the auditor general and treasurer of the city are authorized and required to appoint," etc. The local Act of March 30, 1867, P. L. 630, had provided that the select council of the city of Scranton should be commissioners for purposes named in the 6th section, and then, in the 7th section, provided, inter alia, as follows : " That the said commissioners shall appoint one suitable person as appraiser of mercantile taxes within said city which taxes shall be paid to the treasurer of said city who shall issue licenses therefor, under the same regulations as are prescribed in relation to the appraisers and treasurers of counties and all appeals in relation to the same shall be determined in the mayor's court for the city of Scranton."

The intent to apply the act by the hand of the county commissioners—" except in cities of the first class "—is clear. The very naming of the exception plainly indicates the intended application of the act to every case not comprehended in the exception. The city of Scranton was not within the exception. As to it, there was a local law with provisions repugnant to the provisions of the general law. The 5th section provided that, "All acts or parts of acts now in force in reference to the publication of mercantile liquor and other licenses, except as hereinbefore provided, shall continue to be and remain in full force and virtue."

The conflict had no relation to the publication of notice and was therefore not affected by the continuing clause just quoted. It was held that the 3d section of the act of 1887 repealed the 7th section of the local act of 1867. Both the local act and the general legislation to which the general act of 1887 was supplementary had provided for an appeal, but in the case of the local act that appeal had been to the mayor's court for the city of Scranton, and that court was abolished by the adoption of the constitution. In the opinion, page 112, we find this lan-

guage : " We have already shown that part of section 7 providing for an appeal to the mayor's court of the city of Scranton has been rendered inoperative by reason of the adoption of the constitution and schedule of 1874. The general legislation on the subject of this mercantile tax provides a remedy to every aggrieved broker or dealer by an appeal to the common pleas court. The legislative intent that all dissatisfied brokers or dealers shall have a remedy is so clear that we cannot conclude that the brokers and dealers of the city of Scranton are to be denied that privilege, which would be the case if we were to hold that there had been no repeal of the 7th section of the act of 1867."

On the same page, the judge writing the opinion had previously said : " The provisions of this act clearly show that it is a general one intended to apply to the whole state." The ratio decidendi is to be found in these two facts specially mentioned. By the intention of the legislature the local and the general act are thrown into conflict. They must be presumed to know that, by reason of their inconsistencies, they cannot both operate, and that, therefore, the later one must have been intended as a repeal of the earlier local one.

There is certainly nothing in this case that bears any resemblance to the case in hand. The nearest approach to a practical application of the language, quoted by counsel for respondent from the discussion on page 111, is, when the court says, " we are to be guided by the light of these decisions in deciding upon the effect of the 3d section of the act of 1887."

The cases referred to we have already considered. There is nothing in this case that justifies the conclusion that the constitutional provisions with reference to local and special laws, of their own vigor, impute to the legislature the particular intent to repeal a local law by the simple enactment of a general law, which, in its words and its substance, affords no evidence whatever of any intent to repeal. There is no case that has been cited, or which we have examined, that conflicts, when properly considered, with what Mr. Justice TRUNKEY said in Malloy v. Com., 115 Pa. 25. " The constitution of 1874, upon many subjects prohibits local or special legislation, but it changes no rule relative to the repeal by legislation, of local laws existing when it was adopted."

Neither before nor since the adoption of the new constitution will the legislature be presumed to intend the repeal of a local law by the mere passage of a general one in the broad terms that are ordinarily employed in passing general laws without any repealing clause. There must be some evidence of that particular intent discoverable in what the legislature has itself done. The intent thus manifested may receive greater emphasis by reason of the fact that the constitution has fostered the policy of curtailing future special legislation, and affording to the legislature the power of getting rid of existing legislation of that kind. But the provisions of the constitution on this general subject are not of themselves sufficient to compel the interpretation of a general statute to mean that the repeal of a local statute was intended, when the general statute itself—and the mode and manner of its intended application—afford no evidence of any such intent.

All that the authorities cited by the respondent establish, in that regard, is that what the general statute itself exhibits is to be examined in the light of the constitutional provision. They do not hold that we may discover, even with that light, an intent that has never been manifested by the legislature.

The objective point against which the act of 1895 was directed was a condition of the state at large, and for the amelioration of that general condition alone was the act designed.

A particular section of the state, embracing eleven counties, had theretofore been specially provided for by the legislature, and taken out of this general condition by the act of 1870, which, thereafter, specially defined its situation, and left it free from this general mischief which the act of 1895 was designed to abrogate. Against that special condition the act of 1895 was not directed, and there is nothing to show that this special condition involved any other mischief which the legislature deemed worthy of correction. There is no legislative ascertainment that any mischief exists in that special condition, and no law has, by the legislature, been devised for the removal of mischiefs that are not ascertained to exist. That the legislature could have repealed the local law by the general one is not enough. They must manifest an intent to do so. Having once provided for this section, in obedience to a local demand, it is against reason to suppose that, in framing a gen-

eral system for the state for the correction of general evils, that it had in view the special situation in which the particular section had theretofore been placed. Thirty years of silence from this section, with no demand for the repeal of the local law, would be some evidence that this special situation was not mischievous and was not the objective point of operation for the act of 1895.

These propositions seem reasonably clear:

(1) When the legislature passed the act of 1870, it must be legally presumed to have meant it to stand for all time.

(2) Because that act deals specially and particularly with the subject of the essentials of contracts that may be entered into in behalf of the county, the legislature is not to be presumed to have intended its repeal from the mere fact of its subsequently having passed a general law regulating the erection of public buildings and its incidents.

(3) Because the act of 1870 is a local law, the legislature is not to be presumed to have intended a repeal or abrogation of it from the mere passing of a general law designed to remove a mischief that affected the state at large, but which (by reason of the local law) did not affect the localities provided for specially.

(4) That the legislature has not, by a repealing clause in the act of 1895, or in any other way, expressly declared its intention that the local act of 1870 should be repealed.

(5) That until the legislature clearly indicates by the terms of the general law, or by its substance, or by its designed function among other laws on the same subject, that the intended scope of its operation necessarily brings it within the limited sphere of a prior local act with different provisions, there is no adequate evidence, arising from those differences alone, that the legislature implied in their action an intent to repeal. The differences do not constitute irreconcilable inconsistencies from which an intent to repeal may be inferred, unless by the clear intendment of the legislature, the two laws are forced into conflict with each other by the applying of the provisions of the general law to the same subject-matter as the provisions of the local law theretofore operated upon.

(6) The use of the general language employed to enact the act of 1895—it being but the ordinary comprehensive language

appropriate for the enactment of a general law—will not be interpreted to manifest a particular intent to repeal the local law of 1870, even through that general language, but for the local law, would be comprehensive enough to make the law operative in Westmoreland county.

(7) The intent to repeal must be manifested by what the legislature has itself done. The mere fact that the constitution prospectively prohibited local legislation and, at most, only fosters a policy whereby the legislature, if it so wills, may abrogate existing legislation of that kind, will not of its own inherent vigor impute to the legislature an intent to repeal a local law, when the general law enacted by the legislature itself bears on evidence whatever of such an intent. The evidence of an intent to repeal found in the performance of the legislature is to be examined in the light of the constitutional provisions, but that light will not create evidence where none exists.

(8) A concrete summary of the foregoing conclusions is that, from an examination of all the sources from which evidence of the intent of the legislature can properly be drawn, the result is that there is no change of the intent manifested by the legislature in the passage of the act of 1870, and that, therefore, that act remains unrepealed by the act of 1895.

We have not stopped to consider a thing asserted on the argument of the case, viz : That the proffered contract (so it is alleged) shows that the parties to the contract considered the act of 1895 as being applicable thereto. It is not pretended that anything in that contract makes it invalid, no matter which act controls the approval. The fact is that the officials who were to act in behalf of the county sought to avoid the necessity of determining which act controlled, by conforming to the requirements of both acts. If we were under the act of 1870, it would not invalidate the contract for two of the judges of the court of common pleas to approve it. If we were under the act of 1895, advertising for four weeks instead of three would not invalidate the contract.

If that endeavor had been completely realized, no one could have said that the contract was invalid, no matter which act applied. Neither can any one say now that anything contained in that contract invalidates the contract, because we are under the act of 1870 and is approved by only one judge.

It was only when the contract failed to get the approval of the two judges that the necessity for determining the legal question as to which act applied unavoidably arose.   Out of the events as they transpired, arose the necessity, for the first time, of determining that legal question, and this proceeding has very properly been instituted for determining that question.

The matter referred to was not pressed as a point of any particular significance, and we may dismiss it, in the same spirit.

*Error assigned* was in awarding peremptory writ of mandamus.

*James S. Moorhead* and *John B. Head*, with them *H. C. Beistel*, for appellant.

*W. H. S. Thomson*, with him *Frank Thomson*, for appellee.

OPINION BY PORTER, J., May 19, 1904:

The proceedings to determine the necessity for the erection of a new courthouse seem to have been conducted by those in authority in the county of Westmoreland with care, and those invested with the discretion to determine the questions arising in this important matter are conceded to have brought to the consideration thereof painstaking deliberation.

Plans and specifications for the proposed new building were adopted by the county commissioners in June, 1901, and approved by both the judges of the court of common pleas.   On August 2d, of the same year, a contract was awarded for the removal of the old building, and on August 10th, of the same year, the court directed the removal of the records to temporary quarters which had been prepared for their reception. Both these undertakings were promptly carried into execution. On October 23, 1901, a contract was duly awarded for the excavation and the construction of the foundation of the new courthouse to be erected in accordance with the adopted plans. This contract has long since been carried into execution.

Twice during the year 1902 bids for the erection of the building were duly advertised for, but no bid was received which met the approbation of all those whose approval was necessary to the contract on behalf of the county.   On May 4, 1903,

all of the county commissioners concurred in certain modifications of the specifications, which action was upon the same day approved by both the judges of the court of common pleas.

With the amended specifications as a basis, bids were invited by public advertisement and on July 9, 1903, seven contractors, all of whom seemed to be responsible, submitted bids for the work; the bids having been publicly opened that of the relators was found to be the lowest and was accepted by the county commissioners. A contract for the execution of the work according to the specifications, with sureties for its faithful performance, having been prepared, the same was approved by one of the judges of the court of common pleas on September 26, 1903, and on the 29th of the same month the county commissioners awarded the contract for the work to the relators, and executed the contract in the form in which it had been approved by said judge. The relators entered upon the ground and proceeded to execute the work according to the terms of the contract.

The respondent does not deny that the relators did the work for which they now demand payment, nor that according to the terms of the contract the amount is due and payable; he bases his refusal to draw his warrant for the amount upon the ground that the contract is invalid. There is no suggestion of fraud in the letting of the contract, nor that the relators were not the lowest bidders, nor that the price agreed upon was not fair and reasonable. Bids for the work had been repeatedly asked for by public advertisement, and the attention of contractors throughout the country who were capable of performing work of this character had been directly called to the undertaking.

There is no dispute as to the facts, and it has been conceded upon the argument of this appeal that the determination of the validity of this contract involves the consideration of only two questions: 1. Was the local act of April 4, 1870, P. L. 834, entitled "An act relating to contracts by county commissioners in certain counties of this commonwealth," repealed by the general Act of April 19, 1895, P. L. 38, entitled "An act to regulate the erection of county buildings." 2. If the local act of April 4, 1870, is still in force, then was its requirement as to public advertisement prior to the opening of the bids complied with.

The first question is so fully considered in the opinion of the learned judge of the court below, and the conclusion at which he arrived is so satisfactorily sustained by the authorities there cited that we do not deem it necessary to supplement what is said on that branch of the case. We are of the opinion that the local act of April 4, 1870, remains in force in Westmoreland county.

This leaves for consideration the sufficiency of the public advertisement of the invitation to bidders to submit sealed proposals for the execution of the work. The provision of the statute material to the inquiry is as follows: " The county commissioners . . . . before making any contract for the erection of any new building or buildings, bridge or bridges, . . . . shall, by public advertisement, printed in not less than two weekly newspapers of the county, if so many be published therein, where the contract is to be awarded, for not less than four weeks, . . . . invite sealed proposals for the same according to the specifications, which shall be written or printed in a book to be kept by the commissioners for that purpose, and kept open for the inspection of all persons for at least four weeks before the time appointed by said advertisement for the opening of said sealed proposals, and which, at the time fixed, shall be publicly opened and the contract awarded to the lowest bidder or bidders."

The specifications for the work in question had been of record in the office of the commissioners for a period considerably longer than four weeks. The commissioners determined to fix the time for the opening of the sealed proposals for July 9, 1903, at 1 o'clock P. M. The invitation for sealed proposals was first published in daily newspapers, beginning more than four weeks prior to the time fixed for the opening of the bids. The statute requires the publication to be in weekly newspapers, a term which has a well recognized meaning, that is, a newspaper published once in each week. A publication in a daily paper was not in accordance with the requirements of the statute, and such publication must be eliminated from the consideration of this question in its legal sense, however material it might be if the good faith of the officers representing the county had been called in question.

The advertisement inviting the sealed proposals for the

erection of the courthouse according to the specifications of record in the office of the commissioners was published in two weekly newspapers of the county on June 16, June 23, June 30 and July 7, 1903, each of said days of publication being Tuesday. The notice was in due form and the invitation was for sealed proposals until 1 o'clock P. M., Thursday, July 9, 1903, at which time the bids were publicly opened in accordance with the terms of the notice. The only question is whether this publication in the weekly papers was in accordance with the provisions of the statute.

The statute is to be construed with a view to the purpose which it is intended to accomplish, to effect the legislative intention, and give effect to all its provisions. The purpose of this statute is to secure competitive bidding, upon equal terms, under conditions which give to all bidders full and accurate information as to the character of the work to be performed. The means used to accomplish the end are the two requirements, (*a*) that the specifications shall be a matter of public record " for at least four weeks" before the opening of the bids ; (*b*) that the commissioners shall " by public advertisement printed in not less than two weekly newspapers of the county, . . . . for not less than four weeks, invite sealed proposals for the same according to the specifications." The requirement in each case involves the element of time. The specifications must be of record " at least four weeks ; " the invitation to bid on the specifications must be " printed in not less than two weekly newspapers . . . . for not less than four weeks." The invitation must refer to the specifications ; in this there evidently was a purpose. An invitation to bid without a reference to the specifications as to the work to be done would be a useless and absurd thing. The things required are intended to contribute to the same end, and in order to be effective they must be done at the same time. The record of the specifications could not accomplish the purpose of the statute if the attention of bidders was not called to the undertaking ; the advertisement for bids would amount to nothing if it did not, as required by the statute, refer to the record of the specifications. The expression " not less than four weeks " is the exact equivalent of " at least four weeks."

When the legislature enacted that the invitation to bid should

be printed in weekly newspapers for not less than four weeks, and in the same connection required that the specifications upon which the bids were to be submitted should be of record at least four weeks, the legislative intention manifestly was that these periods of time should be concurrent. The four weeks during which the advertisement must be published are the same four weeks during which the specifications must be of record; to fix one is to determine the other. The requirement as to the specifications is that they must be of record and open to the inspection of all persons for at least four weeks before the time appointed for the opening of the proposals. This requirement would not be met by having the specifications of record for months before, if they were permitted to be withdrawn from the record during any part of the last four weeks immediately prior to the opening of the bids. The commissioners have a discretion to place the specifications of record and keep them open for inspection for a longer period, but they must do those things during the last four weeks. The requirement as to the specifications is not that they shall be of record for a certain number of days in the week, they must be of record every day of the four weeks; that is, full' twenty-eight days immediately prior to the opening of the bids. This determines the four weeks during which the public advertisement of the invitation to bidders must be printed in the weekly newspapers. A weekly newspaper, regularly issued, must necessarily be printed four times, that is, it must have four publications within those four weeks. The commissioners have a discretion to advertise for a longer period, but no antecedent advertisement could excuse the failure to advertise weekly during the last four weeks immediately prior to the day upon which the bids are opened.

The relation of the things required to be done by this statute to each other, the manifest intention that the publication shall be during the same period that the specifications are on file, and the clearly defined purpose that the latter period must be the four weeks ending with the day before the proposals are opened, lead us to the conclusion that the period during which the advertisement required by this statute must be printed in two weekly newspapers, for four weeks, is the last twenty-eight days prior to the opening of the bids. Computing backward

from July 9, 1903, it appears that, under the undisputed facts of this case, the advertisement was regularly published in two weekly newspapers during each week of said period. This answered the requirements of the statute. The invitation to bidders must be published weekly, four times, in two weekly newspapers, but the first publication is not required to be twenty-eight days before the opening of the bids. The period during which the specifications are required to be of record must determine the days upon which the weeks are to be considered as beginning and ending, for the purposes of this statute.

The judgment is affirmed.